THE POWERLITE OF PUERTO RICO y JULIO GAGOT MANGUAL, demandantes y recurridos, *v.* CORPORACIÓN DE RENOVACIÓN URBANA Y VIVIENDA DE PUERTO RICO, demandada y recurrente.

*Número:* R-84-268    *Resuelto:* 9 de octubre de 1984

*Mariano Ramírez Benet*, abogado de la recurrente; *Vicente Sanabria Acevedo*, abogado de los recurridos.

PER CURIAM: El 9 de abril de 1979 la Corporación de Renovación Urbana y Vivienda (CRUV) contrató los servicios de The Powerlite Company, Inc. (Powerlite o la Contratista), para llevar a cabo obras de tendido de cable eléctrico, aéreo y subterráneo, en una zona de Salinas. La CRUV suplió los planos y especificaciones del proyecto, el cual debía finalizarse el 14 de octubre de 1979.

La Contratista movió su equipo, valorado entonces en $34,000, al lugar del proyecto. Para el 20 de abril la Contratista comenzó a tener problemas con la instalación de los postes. Para el 24 de mayo le comunicó este dato a la CRUV, así como el hecho de que el terreno cedía ante el paso de su equipo. La Contratista se limitó a solicitar prórroga para terminar el trabajo. Para fines de año y comienzo de 1980, Powerlite solicitó nuevas extensiones al contrato por la inestabilidad del terreno. Se le concedió hasta febrero de 1980. Otro atraso considerable se produjo cuando la Contratista fue a comprar para esa época el tipo de cable requerido. El cable no se hallaba en el mercado.

El 25 de agosto de 1980 la CRUV le señaló a la Contratista que hacía más de seis meses que ésta no trabajaba en la obra. Tras varios incidentes, que incluyeron gestiones de Powerlite con el Servicio de Rentas Internas, que le había trabado un embargo, acercamientos financieros al Banco Popular y contactos con Electrim Corporation para la obtención del cable, la Contratista continuó con el proyecto. En enero de 1981 la Autoridad de Energía Eléctrica desaprobó la obra. La Contratista pidió que se le permitiese ajustar el

proyecto a los requerimientos de la Autoridad de Energía Eléctrica, lo cual entrañaba cambios de consideración. La CRUV se negó. Señaló que la fecha de terminación enmendada había vencido el 14 de febrero de 1980 y que la obra no había sido entregada hasta el 15 de noviembre de 1980. La Autoridad de Energía Eléctrica tuvo que desmantelar las instalaciones efectuadas por Powerlite, la Contratista, y reconstruir el proyecto. Powerlite no realizó más operaciones en este u otro proyecto y su presidente, el ingeniero Gagot Mangual, abandonó la isla y obtuvo empleo con una agencia federal en California. La Contratista no mudó su equipo, éste se deterioró y tuvo que venderse por una pequeña suma.

Poco tiempo después, Powerlite y el ingeniero Gagot demandaron a la CRUV por daños. Celebrada la vista, el Tribunal Superior falló a favor de los demandantes y ordenó el pago por la CRUV de las partidas siguientes: 1) $24,000 por la pérdida del equipo de la Contratista; 2) $6,617.60 por los intereses acumulados sobre un préstamo de la Contratista con el Banco Popular, más los que se acumulasen hasta satisfacer la sentencia; 3) los intereses acumulados y por acumular sobre la suma de $12,536.75 adeudada a Electrim Corporation por la Contratista; 4) $40,000 por los daños y perjuicios ocasionados por los actos alegadamente negligentes de la CRUV; y 5) la devolución del retenido de $13,453.85, más los intereses legales sobre tal cantidad a partir del 15 de noviembre de 1981, más las costas. La CRUV recurrió a este foro.

Antes que nada debe señalarse que este pleito no trata de fijar la responsabilidad del dueño-arquitecto, de un lado, y del contratista, del otro, frente a tercero. Tampoco se trata de precisar la responsabilidad *inter se* de estos actores cuando se le haya causado daño a un tercero. El litigio versa exclusivamente sobre la responsabilidad cuasidelictual entre sí del dueño-arquitecto y el contratista.[1] Aunque no nos

---

[1] El aspecto de la responsabilidad *ex contractu* de las partes no se discute aquí, ya que la acción se instó sobre bases estrictamente delictuales.

enfrentamos en consecuencia a una acción decenal, aspectos de las normas sentadas en ese campo son de valor para analizar los conceptos de la culpa y la causalidad en este género de controversias. La tarea central a realizar en este caso es describir la responsabilidad del arquitecto por planos defectuosos o vicios del suelo y los deberes del contratista cuando ello ocurra. El Art. 1483 del Código Civil, 31 L.P.R.A. sec. 4124, dispone, en parte:

> El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez años . . . ; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.

Lo que quiere decir este artículo básicamente es que el arquitecto responde frente a tercero por ruina debida a vicios del suelo o de la dirección.[2] El artículo no es invocable por todo contratista en toda circunstancia para librarse de culpa frente al dueño y aun al propio arquitecto.

■ En *Géigel v. Mariani*, 85 D.P.R. 46, 50–51 (1962), expresamos con aprobación:

> Se ha sostenido además que no releva de responsabilidad al arquitecto, o al contratista, en su caso, el que se establezca que se le llamó la atención al dueño de los vicios de la propuesta construcción. Es obligación del contratista en ese caso no proceder a construir la obra. La razón para que esto sea así es que se considera de enorme interés público la seguridad de lo que se edifica. . . . [C]omo el ingeniero contratista es un técnico conocedor de su arte, la ley le impone la obligación de rehusar construir, si la obra propuesta no reúne las condiciones de seguridad que la profesión, las leyes y los reglamentos requieren. (Cita y escolio omitidos.)

Véase *González v. Agostini*, 79 D.P.R. 510, 517 (1956).

La regla puertorriqueña sobre este particular refleja la tradición civilista. Además de las autoridades citadas en

---

[2] No estamos discutiendo, por no estar la cuestión envuelta en este caso, la forma y el grado a que responde cuando el contratista contribuye a la ruina.

*Géigel* y *González,* supra, véanse: J. Herrera Catena, *Responsabilidades en la Construcción,* Granada, Gráficas del Sur, 1977, T. 1, Vol. 2, págs. 206–207, 265; J. Cadarso Palau, *La responsabilidad decenal de arquitectos y constructores,* Madrid, Ed. Montecorvo, 1976, págs. 265–266, 285–286; H. y L. Mazeaud, J. Mazeaud, *Traité Théorique et Pratique de la Responsabilité Civile,* 6ta ed., París, Eds. Montchrestien, 1970, T. II, págs. 73–74; G. Liet-Veaux, *Le Droit de la Construction,* 7ma ed., París, Ed. Celse, 1982, pág. 279.

█ En el caso de autos el contratista tenía la capacidad de percatarse y se percató, desde el propio comienzo, de los vicios del suelo. Debió negarse a realizar el proyecto. Powerlite no puede escudarse en que le avisó al dueño, quien suplió los planos, de las dificultades que estaba enfrentando. Powerlite solicitó varias extensiones y continuó la obra con el resultado previsible: la obra no cumplió con los reglamentos aplicables y tuvo que reconstruirse. No existe base en derecho para reembolsar a la Contratista por el deterioro de su equipo, que ella no se ocupó en trasladar, ni por los intereses de préstamos en que incurrió o el dinero retenido (la Contratista no entregó la obra a tiempo e incumplió el contrato); ni tampoco puede reclamar gastos por su propia tardanza en ordenar el cable a tiempo. En lo que respecta a los daños de $40,000 concedidos, la mayor parte de éstos, si no la totalidad, son producto de la propia acción de la Contratista al resolver continuar la obra. La acción de la Contratista, excepto en un extremo, no puede prosperar respecto a partida alguna de las concedidas por faltar los elementos de culpa y causalidad. El único extremo que puede considerarse es el daño causado por suplir planos deficientes. Tal daño estaría limitado al perjuicio sufrido al trasladar el equipo y efectuar otros preparativos y transacciones antes de percatarse Powerlite de la condición del suelo. Aunque tales daños no deben exceder, a lo sumo, de $20,000, el 50% de lo concedido, el tribunal de instancia deberá fijar la cuantía

correspondiente dentro de ese límite a la luz de la prueba que se presente.

*Se expedirá el auto, se revocará la sentencia recurrida y se devolverá el caso a instancia para procedimientos compatibles con esta opinión.*